UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at COVINGTON


CIVIL ACTION NO. 11-46-GWU


JENNIFER R. CARPENTER,                                              PLAINTIFF,


VS.                            **MEMORANDUM OPINION**


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                        DEFENDANT.


## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative

denial of her applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI).  The appeal is currently before the court on cross-motions

for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation

process in assessing whether a claimant is disabled.

1.    Is the claimant currently engaged in substantial gainful activity?
      If so, the claimant is not disabled and the claim is denied.

2.    If the claimant is not currently engaged in substantial gainful
      activity, does he have any "severe" impairment or combination
      of impairments--i.e., any impairments significantly limiting his
      physical or mental ability to do basic work activities?  If not, a
      finding of non-disability is made and the claim is denied.

11-46  Jennifer R. Carpenter

3.      The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.      At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.      If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence.  Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

2

11-46  Jennifer R. Carpenter

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform,

3

11-46  Jennifer R. Carpenter

then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental

4

contaminants . . . rote application of the grid [guidelines] is inappropriate . . . ."
<u>Abbott v. Sullivan</u>, 905 F.2d 918, 926 (6th Cir. 1990).   If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  <u>Id</u>. In such cases, the agency may be required to consult a vocational specialist. <u>Damron v. Secretary</u>, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.   <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

### DISCUSSION

The plaintiff, Jennifer R. Carpenter, filed applications for DIB and SSI on December 1, 2000, alleging disability beginning January 1, 1996 due to "heart problems and depression."  (Tr. 60-2, 262-4, 278).   After a lengthy series of administrative denials, appeals, and remands, an Administrative Law Judge (ALJ) issued a decision dated July 16, 2008 finding that Mrs. Carpenter was disabled as of September 17, 2003.  (Tr. 40).  Between the alleged onset date (AOD) of January 1, 1996 and September 16, 2003, he determined that, while she had "severe"

5

impairments consisting of mitral valve stenosis with regurgitation status-post January, 1996 mitral valve repair surgery; degenerative disc disease at L4-L5; asthma; chronic pain syndrome; and major depression, she had retained the residual functional capacity to perform a significant number of "sedentary" level jobs, and therefore was not entitled to benefits. (Tr. 30-43). This determination became the final decision of the Commissioner when the Appeals Council declined to review it (Tr. 10-12), and this action followed.

At the most recent administrative hearing on April 17, 2008, the ALJ asked the Vocational Expert (VE) whether a person of the plaintiff's age, education, and work experience could perform any jobs if she were capable of lifting 25 pounds occasionally and 10 pounds frequently, standing and walking six hours in an eight-hour day, and sitting six hours in an eight-hour day, and also had the following non-exertional restrictions. She: (1) could occasionally climb, balance, kneel, crouch, crawl, stoop, and reach; (2) was restricted from exposure to vibration or hazards; and (3) had a mildly impaired ability to relate to others, including fellow workers and supervisors, and to withstand the stress of day-to-day work, and to maintain social functioning and concentration, persistence, and pace. (Tr. 1262-64). The VE responded that there were jobs such a person could perform, such as sedentary bench assembler, inspector, and clerk, and proceeded to give the numbers in which they existed in the regional and national economies. (Tr. 1262-65).

11-46  Jennifer R. Carpenter

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, or if there was an error of law.  The plaintiff's Date Last Insured (DLI) for purposes of her DIB application was September 30, 1998, meaning that she was required to show disability before that date in order to qualify for benefits.[1]

The plaintiff's sole issue on appeal is the ALJ's choice of onset date, which the plaintiff challenges on a variety of grounds.

Medical evidence in the transcript shows that Mrs. Carpenter, after suffering from chest pain and shortness of breath in 1995, was diagnosed with mitral stenosis and moderate mitral regurgitation.  Dr. John R. Robinson performed an open mitral commissurotomy and mitral ring angioplasty on January 5, 1996.  (Tr. 155-7).  By January 25, 1996, Dr. Robinson reported that her exercise tolerance had improved to the point she was able to go up and down stairs, do normal housework, and even walk around stores without dyspnea.  (Tr. 148).  Her "functional class" had improved from III to I.  The New York Heart Association Functional Classification of Cardiovascular Disease places Class I as referring to "patients with no limitation of

---

[1]Her SSI application would not be affected by the DLI.  Counsel for the plaintiff asserts that she would not be eligible for SSI during the relevant period due to her husband's income at the time.  (Tr. 1225).  Plaintiff's Memorandum in Support of Motion for Summary Judgment, Docket Entry No. 11-1, at 3.  Therefore, the court considers the SSI issue waived, and will focus on the plaintiff's condition between her alleged onset date of January 1, 1996 and the September 30, 1998 Date Last Insured.

activities [who] suffer no symptoms from ordinary activities." American Medical
Association, Guides to the Evaluation of Permanent Impairment, Sixth Ed. (2008),
at 48.  The plaintiff's cardiologist, Dr. D. Louis Kennedy, reported on August 28,
1996, that she was doing well, had an unremarkable cardiac examination, and was
having no residual problems from her surgery.  (Tr. 465).  In August, 1997, Dr.
Kennedy noted that she had no cardiac complaints and her examination was largely
benign with no mitral regurgitation.  (Tr. 436).  He requested that she stop smoking
and return in a year.  (Tr. 464).  No functional restrictions are given.  This was her
last recorded visit before the DLI.  In March, 1999, over five months after the DLI,
Mrs. Carpenter returned complaining of chest pain at night.  (Tr. 459).  Her
examination was again benign, and Dr. Kennedy assessed the chest pain as most
likely being of gastroesophageal origin.  (Tr. 459).  A stress echocardiogram was
ordered, but the results, while "abnormal," were interpreted by Dr. Richard W.
Grover as not diagnostic of ischemia.  (Tr. 455).  She was briefly hospitalized in
July, 1999 with chest pain, and a stress test was positive, but further testing
consisting of a coronary angiogram and a left ventriculogram was normal, and it was
concluded that the stress test had been a false positive.  (Tr. 397).

There is other evidence from before the DLI in the form of brief office notes
from Dr. Jerry Dempsey, the plaintiff's treating family physician.  He treated Mrs.
Carpenter for complaints of depression beginning in June, 1996, and prescribed the

anti-depressant medication Paxil, which was increased the next month.  (Tr. 554-5).

Apparently she did not return until April 29, 1997, describing concern over chest

pain; however, this had been diagnosed as chest wall pain at the emergency room.

(Tr. 553).   She was now experiencing pain in her right arm and left leg.   Dr.

Dempsey's examination showed multiple trigger points in her back, which he felt

were consistent with fibromyalgia. He added Elavil to her Paxil. (Id.).  She was next

seen almost a year later on March 25, 1998 with no complaints and reduced

anxiety.  (Tr. 552).   The physician noted that she was coping very well with a very

active daughter and " chronic health problems."  (Tr. 552).   On the Zung Anxiety

Scale the result was normal, and on the Zung Depression Scale her score was 48,

at the high end of normal.  (Id.).  He diagnosed dysthymia and advised her to try to

taper down on Paxil.  (Id.).  However, on September 21, 1998, just before the DLI,

the plaintiff described depression, mood swings, crying, and increased anxiety, and

her Paxil dosage was increased.  (Tr. 551).

Dr. Dempsey wrote an extensive office note on December 2, 1998,

approximately two months after the DLI, noting that the plaintiff had come in for a

disability examination.  (Tr. 549).  She reported she "had not really been able to

work" since open heart surgery on "January 5, 1995" (it was actually 1996).  (Id.).

She said she remained short of breath with minimal activity, in contrast to her

previous statements to Drs. Robinson and Kennedy.  She was also "unmotivated,"

had lost interest in pleasurable activities, and had felt confined and "trapped" when she had attempted an office job the previous year.  (Id.).  She did not have suicidal thoughts.  His cardiac and pulmonary examination was normal, and nothing was said about fibromyalgia or any other musculoskeletal complaint.    (Id.).  Nevertheless, Dr. Dempsey assessed "significant exertional dyspnea" along with "what appears to be significant depression," and prescribed a change of medication to Effexor. (Id.).  The next office note from this source is dated July 9, 2001.  (Tr. 548).  As previously noted, testing for cardiac issues in 1999 was non-diagnostic.

Dr. Dempsey completed a residual functional capacity assessment form on March 7, 2002, reporting that his patient could lift 0-5 pounds occasionally, and nothing frequently, could stand or walk no more than one to two hours a day (30 minutes without interruption), sit two to three hours in an eight-hour day (one hour without interruption), could "never" perform any postural activities, had limitations on reaching, handling, feeling, pushing, pulling, and working around heights, moving machinery, temperature extremes, chemicals, dust, fumes, and humidity.  (Tr. 542-44).  Her conditions were fibromyalgia, mitral stenosis, depression, anxiety, back pain, and hypertension.  He opined that she was totally disabled and had been since January 1, 1996.  (Tr. 542).

Other functional capacity assessments were completed by sources who did not examine Mrs. Carpenter until after the DLI.  Dr. Eyad Al-Haj described

11-46  Jennifer R. Carpenter

limitations similar to Dr. Dempsey's on February 2, 2002, and also opined that she had been "disabled & under these restrictions since 1-1-1996" (Tr. 572-74), but there is no indication he treated her before January 20, 2000 (Tr. 541).  Dr. Michael Grefer, an orthopedist, treated the plaintiff for back and leg pain beginning December 16, 2002, and completed a functional capacity assessment in June, 2004 limiting her to less than sedentary level exertion.  He also asserted that due to multiple longstanding back problems, she had been unable to work since January, 1996, with the exception of unsuccessful work attempts ending in 1999, and she could only tolerate "sedentary" activities around the home, where she could have frequent changes of position and frequent rest periods.  (Tr. 646-49).

Dr. Michael Simons, a specialist in pain management, treated Mrs. Carpenter on referral from Dr. Grefer after the latter had obtained an MRI of the lumbar spine showing early degenerative disc desiccation at L4-5 with a "focal central annular tear" and "small disc protrusion" at the same level.  (Tr. 599, 616).  His functional capacity assessment indicating that the plaintiff could perform less than sedentary level work was completed on June 25, 2004, and while it did not specifically relate the restrictions back to an earlier period, the ALJ accepted the date of his first examination, September 17, 2003, as the date the plaintiff became disabled.  The only other physical assessment from an examining source was from a one-time consultative orthopedist, Dr. Richard Sheridan, in June, 2006.  His examination

11

showed few positive findings.  He felt that she would be able to lift 25 pounds occasionally, and 10 pounds frequently, with occasional climbing, balancing, kneeling, crouching, crawling and stooping, and limited reaching.  (Tr. 757-77).

The ALJ at the most recent administrative hearing submitted the evidence to a Medical Expert (ME), Dr. Ronald Kendrick, an orthopedist.  Dr. Kendrick testified that the evidence indicated that Mrs. Carpenter had recovered very well from her open heart surgery and had no residual problems.  (Tr. 1219).  She had degenerative disc disease involving L4-5, and several MRI scans.  The most recent scan from 2006 had no evidence of direct nerve compression.  (Id.).  She also had evidence of asthma and chronic pain syndrome.  (Tr. 1220).  Although functional capacity assessments were "all over the place," he did not think that she met any of the Commissioner's Listings of Impairment, but he disagreed with Dr. Sheridan's belief that she could perform light level work as late as 2006.  (Tr. 1220-21).  He believed that her pain had worsened gradually since 1996, and a good onset date would be when she was referred to pain management (Dr. Simons) on September 17, 2003.  (Tr. 1222-23).  He pointed out that Dr. Simons' initial office note referred to back and leg pain for about a year, and there was no mention of it dating back to 1996.  (Tr. 1224).

The ALJ accepted Dr. Kendrick's expert testimony as being consistent with the overall evidence of record.  (Tr. 37).  He considered the more restrictive

11-46  Jennifer R. Carpenter

functional assessments from the treating sources outlined above, but correctly noted that even a treating source opinion must be accompanied by sufficient signs, symptoms and objective findings to be entitled to controlling weight under 20 C.F.R. § 404.1527(d), and that a conclusory statement that a patient was "disabled" was not binding.  (Tr. 38).

With these principles in mind, the ALJ discounted the opinions of Drs. Dempsey and Al-Haj because of the lack of detailed findings in their office notes. Although Dr. Dempsey sometimes found trigger point tenderness (e.g., Tr. 547, 553) and Dr. Al-Haj occasionally mentioned trigger point tenderness (e.g., Tr. 603), there was nothing else in the notes of either physician to support a disabling functional capacity assessment (Tr. 39).  Also, the ALJ contrasted Dr. Dempsey's citation of mitral stenosis as one of the grounds for his restrictions with the evidence, including the testimony of the ME, Dr. Kendrick, that the plaintiff's mitral valve surgery was successful and she was doing well.  (Id.).  The court agrees, and also notes that in addition to the lack of specific findings by either physician, Dr. Al-Haj did not begin treating Mrs. Carpenter until January, 2000 (Tr. 541), well after the DLI, and that Dr. Dempsey's notes from just before the DLI appear to indicate that her only problem was depression (Tr. 551), although six months earlier she had been coping very well with no complaints (Tr. 552), thus raising a durational issue even for that condition.  The ALJ's rationale is sufficient to satisfy the "good

13

reasons" requirement of 20 C.F.R. § 404.1527(d).   Wilson v. Commissioner of Social Security, 378 F.3d 541, 546 (6th Cir. 2004).

Regarding Dr. Grefer's assessment, the ALJ held that his clinical findings of decreased ankle reflexes, weakness of heel-toe gait, and decreased sensation are not supported in his notes for the period prior to September 17, 2003.  (Tr. 38, 602, 646).  Dr. Simons did not record sensory changes until July, 2004, after the onset date.  (Tr. 39, 862).  Therefore, substantial evidence also supports the ALJ's rejection of his opinion.

## SELECTION OF THE ONSET DATE

As noted above, the ALJ accepted the ME's testimony that the date of Mrs. Carpenter's first visit to Dr. Simons was a good onset date.  The plaintiff challenges this finding.   However, it is longstanding Sixth Circuit case law that the Commissioner does not have to do more than provide substantial evidence to support an onset date.  He is not required to provide evidence that would eliminate other possible onset dates.  Willbanks v. Secretary of Health and Human Services, 847 F.2d 301, 303 (6th Cir. 1988); Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992).   The opinion of the ME, Dr. Kendrick, is certainly substantial evidence.

The plaintiff argues, however, that the ALJ made a reversible procedural error by not citing Social Security Ruling (SSR) 83-20, concerning the selection of

11-46  Jennifer R. Carpenter

an onset date.  The Sixth Circuit specifically rejected an argument that failing to mention 83-20 was fatal to an ALJ's decision, however.  <u>McClanahan v. Commissioner of Social Security</u>, 193 Fed. Appx. 422, 426, 2006 WL 2431000 (6th Cir. 2006).

SSR 83-20 instructs a decision-maker to consider the following factors in determining the onset date, where disabilities are of non-traumatic origin: (1) as a starting point, the individual's allegations; (2) the day the impairment caused the individual to stop working; and (3) above all, the medical evidence, which "serves as the primary element in the onset determination."  SSR 83-20, at *4-5.  The plaintiff argues that the ALJ did not give sufficient consideration to the first two factors, and that, had she done so, she would have selected an onset date of January 1, 1996.  The ruling does specify that the weight given to the different factors depends on the individual case, but that the third factor, medical evidence, is "basic."  <u>Id.</u>  "The onset date should be set on the date when it is more reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in [gainful activity] for a continuous period of at least 12 months . . . .  Convincing rationale must be given for the date selected . . . .  At the hearing, the ALJ should call on the services of a medical advisor when onset should be inferred."  This is what the ALJ did.

15

11-46  Jennifer R. Carpenter

Although the ALJ may not have mentioned SSR 83-20, the decision shows that she properly considered the plaintiff's allegations, including her work for short periods in 1996, 1997, and 1999 (Tr. 27) as well as an extensive review of her lengthy medical records (Tr. 31-7).  The plaintiff would like her to have weighed the 83-20 factors differently, but the fact is that she substantively followed the procedures of the ruling, and substantial evidence supports the selected onset date.

## PREVIOUS ME TESTIMONY

The plaintiff maintains that it was reversible error not to give weight to the testimony of a previous medical expert, Dr. Thomas Saladin, who appeared at the June 30, 2004 administrative hearing.  The plaintiff asserts that Dr. Saladin testified that her correct onset date was January 1, 1996.  Dr. Saladin's testimony was not so definitive.  He identified Mrs. Carpenter's three problems as emotional difficulties, mitral stenosis, and back and related conditions (Tr. 1148), and stated that he "had" to agree with the less than sedentary restrictions given by Drs. Dempsey, Al-Haj, Grefer, and Simons (Tr. 1156-8), but did not testify concerning an onset date.  Dr. Saladin was evidently a gastroenterologist (Tr. 1147) who felt he had to defer to the opinions of the examining sources (Tr. 1154), and in fact the Appeals Council remanded the 2005 ALJ decision because Dr. Saladin based his testimony on the opinions in the record rather than on his own interpretation of the evidence (Tr.

16

11-46  Jennifer R. Carpenter

699).  Under the circumstances, it was reasonable to give more weight to the opinion of Dr. Kendrick, an orthopedist.

The plaintiff also asserts that it was error for the ALJ to refuse to allow her counsel to question Dr. Kendrick about Dr. Saladin's testimony.  (Tr. 1234).  She cites Blakley v. Commissioner of Social Security, 581 F.3d 399, 408 (6th Cir. 2009) for the proposition that a medical expert must have had an opportunity to review all evidence in the case if his opinion is to be accepted over that of a treating source or sources.  As the Blakley decision says, "the ALJ's decision to accord greater weight to state agency physicians was not, by itself, reversible error," and went on to cite SSR 96-6p, which provides that: "In appropriate circumstances, opinions from state agency medical . . . consultants may be entitled to greater weight than the opinions of treating or examining sources," such as when the "consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source."  Id. at 83.

In the present case, Dr. Kendrick had reviewed the evidence and opinions from treating and examining sources, and the only item being withheld was the opinion of another non-examining source, who, unlike Dr. Kendrick, was not even a specialist in orthopedics.  Clearly, 96-6p is concerned with examining and treating source findings and opinions, particularly if they are specialists.  See 20 C.F.R. §

17

11-46  Jennifer R. Carpenter

404.1527(d)(5).  No useful purpose would be served by remanding the case for additional consideration of the opinion of a non-examining physician who is not a specialist in the claimant's ailments.

## CONSULTATIVE REPORTS

Another issue is the plaintiff's claim that the ALJ did not give enough weight to consultative examiners Dr. Susan Stegman and psychologist Mark Kroger.  Dr. Stegman examined Mrs. Carpenter one time in 2006 and her examination showed few abnormalities.  (Tr. 745).  She provided a medical source statement describing severe limitations, but she specifically added they were subjective and based on her history; her motor examination and range of motion were normal.  (Tr. 748). Psychologist Kroger diagnosed a pain disorder and a mood disorder, with marked to extreme restrictions in her ability to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting.  (Tr. 765).  This examination also took place in 2006, well after the selected onset date, and Kroger did not indicate that the restrictions would have been in effect prior to the date of the examination.  These reports do not support an earlier onset date and the ALJ fully considered both opinions in her decision (Tr. 35-36).

## THE PSYCHOLOGICAL EVIDENCE

Although the claimant does not seem to explicitly argue that she was disabled due to a mental impairment, she does somewhat tangentially raise an

18

11-46  Jennifer R. Carpenter

issue regarding improper weight given to various findings in the record regarding her mental status.  Dr. Dempsey did diagnose depression prior to the DLI, based on the plaintiff's statements and her responses to a self-scoring questionnaire on depression, the Zung Scale (Tr. 551, 555); however, the problem was not continuous as there were also office visits during the period where depression was not mentioned, or where she was said to be coping well (Tr. 552-3).  Moreover, although Dr. Dempsey included anxiety and depression among her diagnoses on his RFC, he did not list any specific functional restrictions related to them.  (Tr. 544). A consultative psychologist, George Lester, examined Mrs. Carpenter in January, 2001, more than two years after the DLI, and concluded that she had only a mildly impaired ability to relate to others, including fellow workers and supervisors, and to deal with the stress of day-to-day work activities.  (Tr. 486-7).  The ALJ could reasonably have accepted the testimony of Dr. Shakiel Mohamed, a psychiatrist who testified as an ME at the April 17, 2008 hearing, that the plaintiff did not have any documentation of a "severe" psychological or psychiatric problem prior to the DLI.  (Tr. 1252).

### FIBROMYALGIA AND COMBINATION OF IMPAIRMENTS

Dr. Dempsey diagnosed fibromyalgia prior to the DLI based on a finding of trigger points.  (Tr. 553).  The plaintiff suggests it was error not to find this condition "severe," and that it was improper for the ALJ to cite American College of

19

11-46  Jennifer R. Carpenter

Rheumatology criteria to find the condition was "non severe." (Tr. 28-9).  However, Dr. Kendrick also testified that in his opinion it was not clear Mrs. Carpenter had fibromyalgia, because such a diagnosis was usually made by a rheumatologist who has ruled out other disease processes.  (Tr. 1235).  The Sixth Circuit has also noted that the process of diagnosing this condition includes the ruling out of other possible conditions through objective medical and clinical trials.  Preston v. Secretary of Health and Human Services, 854 F.2d 815, 820 (6th Cir. 1988); Rogers v. Commissioner of Social Security, 486 F.3d 234, 244 (6th Cir. 2007).  Given Dr. Kendrick's testimony and these precedents, there was no error.

The plaintiff provides a long list of diagnoses and impressions taken from physicians' reports, and argues that it was erroneous not to find that they were "severe" and to consider them in combination.  20 C.F.R. § 404.1523 provides that all of a claimant's impairments, whether or not they are found to be "severe," are considered in combination in determining if the claimant meets or equals a listed impairment.  See also Maziarz v. Secretary of Health and Human Services, 837 F.2d 240, 244 (6th Cir. 1987).  It is still the plaintiff's burden to produce medical evidence that a listing is met or equaled.  The court finds no error in this regard.

## EDUCATIONAL LEVEL

The ALJ's hypothetical question to the VE asked him to assume that the individual had, like the plaintiff, a high school level education.  (Tr. 1259, 1262).

20

11-46  Jennifer R. Carpenter

The plaintiff points out that in the 2006 testing by psychologist Kroger, she had high school level reading but only seventh grade spelling and fifth grade arithmetic skills. (Tr. 758).  20 C.F.R. § 404.1564(b) provides that a numerical grade level may not represent a claimant's actual abilities, but will be used if there is no evidence to contradict it.   In the present case, evidence of somewhat lower spelling and arithmetic ability exists, but the Dictionary of Occupational Titles (DOT) sections corresponding to the jobs of bench assembler (DOT 706.684-042), dowel inspector (DOT 669.687-014), and food and beverage order clerk (DOT 209.567-014) indicate that they only require "Level I Math," which is described as the ability to add and subtract two-digit numbers, multiply and divide 10s and 100s by 2, 3, 4, 5, and perform basic operations with units of measure.  There is nothing in the description of either job regarding ability to spell.  Consequently, a remand for further vocational testimony on this issue would be futile.

The court concludes that the administrative decision is supported by substantial evidence, and will be affirmed.

This the 17th day of February, 2012.



**Signed By:**

_G. Wix Unthank_

**United States Senior Judge**

21